## Hayden v. Nutt et ux.

In principle, no distinction can be made between a conventional transfer of property by a husband to his wife for the payment of her dotal or paraphernal rights, and one made under the form of judical proceedings. *Per Curiam:* Where there has been an amicable suit in which the wife charges, and the husband confesses, a debt, and the judgment thus rendered is executed by the sheriff, the parties, so far as creditors are concerned, stand subtantially in no better position than if they had merely clothed their contract with the form of a notarial act.

| | |
|---|---|
| 4 | 65 |
| 46 | 294 |
| 46 | 990 |
| 4 | 65 |
| 52 | 1437 |
| 4 | 65 |
| 115 | 163 |
| 4 | 65 |
| 119 | 690 |

The law of the place where the parties intend, at the time of their marriage, to fix their domicil, when there is no marriage contract or one without any provision in this respect, and when that intention is unequivocally ascertained, and supported by a subsequent removal to the place contemplated, governs the rights resulting from the marriage.

Where a marriage is contracted in a State in which the husband was domiciled at the time, and there was no change of domicil, nor any absolute and clear intention to change it, before the receipt by the husband of the property of the wife, the law of the place of the marriage must control the rights of the wife.

By the laws of Virginia and Mississippi money and bank-stock bequeathed to a woman subject to the condition of being returned to the estate of the testator in case of her dying without issue living at her death, will become the property of her husband, by her marriage and the reduction of it into possession by the husband. His obligation to return the amount to the estate of the testator in case of the wife's death without issue living at the time, cannot prevent his acquiring the ownership of her interest, which is personalty.

A husband cannot abandon, in favor of his wife, a claim due to him, to the detriment of his creditors.

Where money and bank-stock were bequeathed by one who resided and died in the State of Virginia, on the condition of its being returned to his estate in case of the death of the legatee without issue living at the time of her death, and the legatee removes to this State and dies here without issue bequeathing the whole of the property to a third person, the bequest made in Virginia, being valid by the laws of that State, it would be to strain the policy of our laws to an unreasonable extent to refuse to enforce it here, in a contest between the executors of the first testator and the legatee] under the will made in this State.

As a general rule, husband and wife are incapable of contracting with each other. The only exceptions to this rule are those enumerated in art. 2421 C. C. Attempted contracts between husband and wife not included in these exceptions, are nullities.

Actions to annul contracts made between husband and wife, not enumerated in the exceptions contained in art. 2421 C. C., are not prescribed by one year under arts. 1982, 1989 C. C., the nullity in such cases resulting from the incapacity of the parties to contract. That prescription applies where the transfer takes place between parties capable of contracting.

An act executed in another State in favor of a vendor by one who had purchased a tract of land in this State, which recites that "for the consideration of one dollar, and the further consideration of securing to the vendor the payment of certain notes" executed for the price, he sells and conveys the property to his vendor, the act stipulating that if he should pay the said notes "then these presents and the estate hereby granted shall become utterly void" &c., duly recorded in the mortgage office of the parish in which the land is situated, will have the effect of a mortgage in this State. C. C. 3257. Nor will the benefit of the mortgage be restricted to the mortgagee ; the transferrees of the debts intended to be secured are entitled to the benefit of the accessory obligation. C. C. 2615.

A mortgage duly registered in the mortgage office of the parish in which the land lies, will not be effected by the subsequent division of the parish, and the establishment of a separate parish embracing the land mortgaged.

HAYDEN
*v.*
NUTT.

APPEAL from the District Court of Madison, *Selby*, J.   This appeal was taken by the plaintiff from a judgment rendered on the verdict of a jury, in favor of the defendants.  *Stockton* and *Steele*, for the appellant.   *Short*, *Thomas* and *Snyder*, for the defendants.   The judgment of the court was pronounced by

SLIDELL, J.   The plaintiff is a creditor of *Nutt*, and instituted this suit for the purpose of setting aside a judgment rendered in favor of *Mrs. Nutt* against her husband, and a judicial sale of lands, slaves, cattle and other property made to her in block, under execution, for a total price of $16,600.   The plaintiff charged that the judicial proceedings between the husband and wife were collusive and fraudulent, and that the alleged indebtedness of the husband to her never existed.

A branch of this case, upon the appeal of another creditor, has been before us.   See *Dennistoun* v. *Nutt*, 2 Annual, 483.   We then expressed the opinion that, in principle, no distinction was to be made between a conventional transfer of property made by the husband to the wife for the payment of her dotal or paraphernal rights, and one made under the form and by the instrumentality of judicial proceedings, upon confession.   To this opinion we adhere.   Where there has been an amicable suit, in which the wife charges, and the husband confesses, an indebtedness, and the judgment thus rendered is executed through the sheriff, the parties, so far as creditors are concerned, stand substantially in no better position than if they had merely clothed their contract with the form of a notarial act.

We shall therefore examine the questions presented in this case as though, in August, 1844, the date of the sheriff's deed, *Nutt* had executed in favor of his wife a sale of the lands, slaves and other property, at the price of $16,600, and in partial satisfaction of an admitted indebtedness to her of $26,883 70, for so much money, her paraphernal property, received by him.

The petition in that cause stated two sources of the wife's claims, one was her interest in the estate of her father, from whom she alleged that she inherited, *in the year* 1839, in her own right, the sum of $10,441 85.   The other was, as the universal legatee of her sister *Susan E. Blake;* who, it was alleged, died in 1839, leaving an estate to an amount of $16,441 85, the whole of which the husband received, and appropriated to his own use.

With regard to the first claim, the material facts are as follows : *Adeline Blake*, the wife of *Nutt*, was a native of Virginia.   Her father resided in that State, and died there in 1831.   By his will he gave his daughters, *Susan*, *Catharine*, and *Adeline*, thirty-five shares each of Virginia bank stock, to be held in trust by trustees named in the will, until each of them should arrive at the age of twenty-one years or marry; and, in the event of either of them dying without leaving a child or children living at the time of their death, the said bank stock so given to them was to return back, and be considered as the testator's estate, and be divided equally among his other children.   After making other legacies the testator directed that the residue of his estate should be divided among his six children, *Frances Brockenbrough*, *Susan*, *Catharine*, *Adeline*, *Benjamin* and *Jane;* "the portion given to the last five named to be held in trust by my trustee hereinafter named, upon the same conditions and limitations as is directed and made with respect to the other devises to them in this my will."   *Brockenbrough* was named executor, and also trustee of *Susan* and *Adeline*.

*Nutt*, who had been a resident of Virgieia, came to Mississippi, in the

fall of 1832. He had been there previously for two or three years. *Adeline* came to Mississippi, in 1832. They remained at Vicksburg, in that State, until March, 1833, when they were married there. Witnesses acquainted with them, at that time, say that it was stated by both parties in conversation before their mrrriage, that they intended to live at New Orleans. On the morning of the marriage they left Vicksburg, and went to New Orleans. *Nutt* was a physician, and perhaps contemplaited the practice of his profession there, as he had done at Vicksburg. They remained however, but two weeks in New Orleans, when they returned to Mississippi. *Nutt* left his wife at a watering place in Mississippi, went to Virginia, received a part of his wife's estate from *Brockenbrough*, and returned to Vicksburg, where he kept house, and resided with his wife until the year 1837. He bought lands in Louisiana in 1834, and occasionally visited them. In 1835, he had some negotiation with a party with regard to erecting a dwelling house on his land; and told this person that he intended to remove thither and reside. But this intention was not carried out until 1837, when he took up his residence upon the lands in the parish of Madison, and has lived there, with his wife, ever since. In May, 1833, when *Nutt* receipted to *Brockenbrough* in Virginia, he described himself in the receipt as of New Orleans. In another receipt, in 1834, he describes himself as of Mississippi. In deeds executed by him in 1834 and 1835 he described himself as of the town of Vicksburg. The bank stock was received by him from *Brockenbrough* in Virginia, in 1833. His amount was $3,500; and it was transferred to *Nutt* personally. In 1834, he received in money, from *Brockenbrough*, in Virginia, about $5,000. The only other payment from the estate on his wife's account was a nett sum of $610 41, received by *Nutt*, in 1839.

It may be conceded that the defendants' counsel is correct in assuming that the marital rights of these parties must be regulated by the laws of their matrimonial domicil. What then was the matrimonial domicil at the time when the husband received the $5,000 and the stock from *Brockenbrough?* The learned counsel for the defendants agree that they intended Louisiana to be their domicil; that they followed up that intention by an immediate removal; and by even their brief sojourn at New Orleans acquired a domicil there. We do not concur in this view of the facts, nor in the legal conclusion deduced from it. We think the testimony does not authorize the belief that they had formed the absolute determination to establish themselves at New Orleans; and their subsequent conduct is the safest guide to their real intention. It was, we think, to live at New Orleans, if it suited them. They went there; remained two or three weeks; it did not suit them; and they returned to Mississippi, where they kept house and were domiciled until 1837.

It is far from our desire to disturb the well settled principle that the law of the place where, at the time of the marriage, the parties intend to fix their domicil, is to govern the rights resulting from that marriage, when that intention is unequivocally ascertained, and supported by a subsequent removal to the place contemplated, within a reasonable time. The doctrine is as ancient as the Pandects, and seems in a remarkable degree to have received the assent of commentators upon the conflict of laws, who are so often found at variance with each other. But the impropriety of applying the doctrine to the present case is perhaps best illustratrated by a brief reference to some of the cases which the counsel for the defence have cited. In *Martin* v. *Ford*, the authority of *Cujas* was cited with approbation. " Mulier non agit ubi matrimonium

HAYDEN
v.
NUTT.

contraxit ; sed ubi ex matrimonio migravit, vel divertit, agit." And it was said by Martin, J.: " We think that it may be safely laid down as a principle that the matrimonial rights of a wife, who, as in the present case, marries with the intention of an instant removal, for residence in another State, are to be regulated by laws of her intended domicil, where no marriage contract is made, or one without any provision in this respect." But what were the facts to which the doctrine was applied ?  The slaves which formed the subject of controversy were the property, and in the possession, of the wife, in the State of Mississippi, before her marriage. She was married in Mississippi ; but her husband had, at the time, a furnished house and farm in Louisiana, and had sent a wagon to remove his wife's property to Louisiana. The wife had previously expressed her intention to reside permanently in Louisiana—left Mississippi for Louisiana the day after the marriage, and lived there with her husband until his death. Before the marriage, the intended husband executed a deed of settlement for the slaves, who were conveyed to trustees for her benefit. The husband was considered, under this state of facts, as having never acquired any right to the slaves.

In *Routh's* case, it was held to be the settled doctrine that, if parties contracted marriage with a *bonâ fide* intention of making Louisiana the place of their matrimonial residence, and in pursuance of such intention did, within a reasonable time, become domiciled in this State, the property belonging to the wife before marriage, and received by the husband afterwards, or at the time, remained her separate property. The facts were that *Routh*, who married sometime between the years 1814 and 1820, was, at the time of his marriage, exercising and enjoying the rights of a citizen of Louisiana ; sometimes acting as a member of the police jury in a parish of Louisiana ; sometimes as a representative in the house of assembly ; frequently as a juror. He also acted, at the time of the marriage, as overseer of his father's plantation in Louisiana, and lived there for some time after his marriage ; and, although subsequently he had a town house at Natchez, still divided his time between the Louisiana and Mississippi residences, and did not relinquish his Louisiana citizenship. There were also other circumstances of a similar import ; and the removal of the wife to Louisiana was proved to have been in pursuance of a previous declared intention of the parties.

Upon a sound construction of these authorities, we cannot consider the law of Louisiana as operating upon the rights of *Mrs. Nutt,* with regard to the sum of $5,000, and the stock received by her husband, and treat them as paraphernal. At the time of the marriage *Nutt* was domiciled in Mississippi. The marriage was contracted there. That domicil was not changed before the receipt of the money and stock ; nor was there an absolute *and clear intention* to change it, the frustration of which could perhaps be regarded as a fraud upon the wife. The law of Mississippi must, therefore, control the wife's rights.

Under that law, we conceive the wife's pretensions cannot be sustained. Her personalty, reduced into possession in the years 1833 and 1834, became his *jure mariti.* It cannot now be treated as her paraphernal estate, because the parties, some years subsequently, chose to remove to this State—a removal evidently disconnected with their original views.

We have considered this branch of the case with reference to the position assumed by *Mrs. Nutt,* that her right as legatee was one of absolute ownership of what was bequeathed to her by the will of her father. But if, on the other hand, we take the legacy as it really was—a legacy, in terms not constituting it

to her separate use, with a right of reversion to the estate of her father, if she should die without issue, does her case stand upon a better footing?

We have not been informed by counsel what would be the effect, by the laws of Virginia or Mississippi, of the receipt of the money by the husband, or the transfer of the stock to his name, under such circumstances. The result of our examination is, that it does not place the wife on more advantageous ground than she would occupy under the hypothesis assumed by herself. The legacy gave her a life interest in the stock and money. That interest passed to him by marriage and the reduction into his possession. His obligation to return so much to the estate of *Blake*, if she died without issue, did not prevent his acquiring the ownership of her interest, which was personalty.

It is, therefore, clear that the wife was not, at the date of the rendition of the judgment in her favor against her husband, the creditor of her husband, as alleged in her petition, and confessed by him, "for the sum of $10,441 85, inherited from her father *Benjamin Blake*, deceased, in the year, 1839, in her own right," "which her said husband received and appropriated to his own use and benefit, without her authority and consent." The utmost extent to which we could treat her as a creditor on that score, would be for the sum of $610 40, received by *Nutt* in 1839, after the domicil was acquired in this State.

The material facts with regard to that portion of her claim which she makes as heir of her sister *Susan*, are as follows : *Susan's* share, under her father's will, was about the same as that of *Mrs. Nutt*. She had a legacy of thirty-five shares of bank stock, amounting to $3,500. Whether *Nutt*, who received the certificate for her, appropriated it to his own use, does not clearly appear. He appears to have collected in cash for *Susan Blake* from *Brockenbrough*, about $2,000 or $3,000. He also collected for her a legacy of $5,000 left to her by *J. B. Blake*, and a sum of $1,000 from the sale of a slave belonging to her. *Susan Blake* made a will in 1838, and died in 1839. She had lived with *Nutt's* family in Mississippi, and afterwards when they came to reside in Louisiana. By her will she gave her entire estate to *Mrs. Nutt*. She states in her will that her property had been in the hands of *Nutt*, and that he was not to pay interest for it. She enumerates a sum of $6,000 as being in his hands, being the *Blake* legacy and the price of the slave; and it is also to be inferred from the will that he was still her debtor for what was received from her father's estate. On the other hand, she recognizes him as her creditor for board and medical attendance, pursuant to her agreement with him. This will was probated; but there is nothing to show that the succession of *Susan Blake* was ever administered. Although *Mrs. Nutt* was the universal legatee, she could only take the residue of the succession after payment of its debts. What they were is not ascertained. That *Nutt* was a creditor appears from the will; and we do not see with what propriety he could, (as counsel say he had the right to do,) abandon an important claim, in favor of his wife, and to the detriment of his creditors. Such, however, was the course pursed; for *Mrs. Nutt* claimed the entire amount of the unadministered succession of *Susan Blake*, and had judgment upon confession accordingly. Moreover the judgment was for a sum considerably larger than was received by *Nutt* on *Susan Blake's* account, during her life time.

But there is another serious objection to *Mrs. Nutt's* claim as heir of her sister ; and which is quite independent of the facts that the succession was not administered, that an important credit was abandoned, and that the amount

HAYDEN
v.
NUTT.

claimed was larger than *Nutt* had received on *Susan Blake's* account during her life time.

By the terms of the will of *Benjamin Blake*, the legacy to *Susan* was not absolute, but conditional. In the event of her death, without issue, the amount bequeated to her was to return back, be considered as part of the testator's estate, and be equally divided among the other children. When *Nutt*, as the agent of the legatee, received her share from *Brockenbrough*, he and his principal being then domiciled in Mississippi, a refunding bond was given by him to *Brockenbrough*, for the restoration of the amount to the succession of *Benjamin Blake*, if *Susan* should die without issue. Upon the faith of that bond, *Brockenbrough* paid the money.

No argument has been adduced to show that the condition of the legacy violated any law of the State of Virginia; nor that there was any thing in the laws of Mississippi which would have prevented *Brockenbrough*, as the executor of *Benjamin Blake*, from recovering the amount of the legacy from the succession of *Susan Blake*, if her succession had been opened there, or from *Nutt*, upon the bond of indemnity.

But it is said that the property was in this State, when the event happened under which the right of return took effect; that the clause created a substitution; conflicts with a prohibition of our law; and that, consequently, the right of *Benjamin Blake's* succession cannot be enforced. The case of *Harper* v. *Stanborough*, 2 Annual 337, is cited.

In that case the controversy was with regard to slaves, which our law considers as real estate, and the issue of slaves born in this State; and the contest was between *William Harper*, the surviving child of the testator, claiming under the limitation of the executory devise, and third persons, who had purchased in good faith at the sale of the succession of *Jesse Harper*. The court held that it would not violate the policy of our prohibitive laws by aiding *William Harper* in disturbing the purchasers. The present case is certainly dissimilar. Here the question involves a sum of money. No creditors of *Susan Blake* are interested in the controversy, nor purchasers from her succession. Waiving the consideration that her succession has not been administered, and that there has been no judicial action by the probate court upon the rights of the legatee under *Susan Blake's* will, let us strip the case of any technical difficulties, and suppose that the representative of *Benjamin Blake's* succession, and *Adeline Blake*, as the legatee of *Susan*, were before us, claiming from *Susan Blake's* administrator a distirbution of her estate. *Adeline Blake* would demand the whole estate under the will; and *Brockenbrough*, as the executor and trustee of the children of his testator, would demand the restoration of the amount which had been paid to *Susan Blake*. It seems to us that in such a contest *Brockenbrough* would prevail. To the tacit obligation of *Susan Blake* to respect the condition attached to the bequest was superadded a new and express contract, at the time of receiving the legacy, that the amount should be restored if she died without issue. There is no reason to believe that this conditional contract for the payment of a sum of money at a future time, was invalid under the laws of Virginia or Mississippi: and it would be straining the policy of our own laws to an unreasonable extent, to refuse to enforce it here in a contest between the legatee of *Susan Blake* and the executor of her father's will. *Brockenbrough*, in his testimony, speaks, with some warmth perhaps, but certainly with reason—" I never knew anything of the transactions between *Susan E. Blake* and *C. R. Nutt*. They lived in Mississippi; I, in Virginia.

But this I know, in justice and equity, four-fifths of *Susan's* estate left by her father should return to the estate of *B. Blake*, as designed by his will, and for which I hold a refunding bond." The claim then of *Mrs. Nutt* was, we think, unfounded, as to the four-fifths of the amount received by *Nutt*, as agent of *Susan Blake*, from her father's estate.

The result of the examination of the two claims is, that the indebtedness of the husband to his wife could not have exceeded the sum of $8000.

But, under the guize of judicial proceedings, conducted amicably and by confession, and which in law are of no greater force than a conventional transfer, *Nutt* has conveyed to his wife a property, which at the standard of a sheriff's sale was worth $16,600, and which the appraisers at the time estimated at a cash value of $24,884 89. This sale is made by an embarassed debtor, pursued at the time by other creditors, confessing a liability to his wife far beyond what was legally due, and, for ought that appears to the contrary, sweeping away, by a sale in block, his entire estate. We are constrained to say that we cannot reconcile the transaction with a proper sense of duty to his creditors.

The law applicable to the contracts of husband and wife has been explained in the case of *Spurlock* v. *Maincr*, 1 Annual, 305, and need not now be considered at large. We then showed that, by the general rule, the husband and wife are incapable of contracting with each other. That the exception is in the three cases enumerated in article 2421 of the Code. That out of these enumerated exceptions attempted contracts between husband and wife are nullities. We are of opinion that the present case does not fall within the exceptions. A large portion of the wife's claim had no legal existence. The utmost amount due fell far below the price at which a large estate was sold in block to the wife. The circumstances are inconsistent with the belief that the sale was effected for the legitimate purpose of satisfying a debt believed to have a real and legal existence to the extent claimed. We are bound, therefore, to give the creditor of the husband relief, by setting aside the sale.

The prescription applicable to a case of this kind is not that established by articles 1982 and 1989 of the Code. That prescription applies to cases where the transfer takes place between parties capable of contracting. The nullity in this case flows from the incapacity of the parties to make a contract not legitimately falling within the exceptions enumerated in the 2421st article of the Code.

The plaintiff also asked to be recognized as the holder of a conventional mortgage upon the undivided half of a tract of land, forming part of the property bought by *Mrs. Nutt* at the sheriff's sale. This undivided interest was bought by *Nutt* from *Dawson*, in 1835; and he executed a deed in the form usual in common law States, by which he declared that, " for the consideration of one dollar, and the further consideration of *securing* to said *Dawson* the payment of four notes, etc.," (those given for the price of the land,) he sells and conveys, etc., the property in Carroll, etc., describing it, with a proviso that if he should pay the notes, " then these presents, and the estate hereby granted, shall become utterly void and cease and determine." This deed was recorded in the mortgage book in the parish of Carroll, where the land lay, in 1835. The parish of Madison, subsequently created, comprised these lands, and the instrument was recorded as a mortgage in the latter parish, in 1845.

This contract would certainly be considered a mortgage in the State of Mississippi, where it was executed; and though it is not expressed in the language in which mortgages are usually expressed in this State, we think it may be

fairly construed as falling under that class of contracts. It is, in its terms, an accessory contract, intended for the assurance of the payment of a principal contract. It is difficult to exclude this instrument, taken in its fair intendment, from the scope of the definition given in our Code—" the conventional mortgage is a contract by which a person binds the whole of his property, or a portion of it only, in favor of another, to secure the execution of some engagement, but without divesting himself of the possession." C. C. 3257. Such was the view expressed by the court in *Smoot* v. *Russell*, 1 Mart. N. S. 524, commenting upon a similar instrument with reference to the corresponding article in the Code of 1808. "It would seem then, " said the court, "to come almost within the letter of the definition, and there would be little difficulty on our part in saying that it came completely within it, were it not for a subsequent provision of the same authority, article 6, which declares that there is no conventional mortgage except that which is expressly stipulated in the act or writing made between the parties ; it is never understood, and is not inferred from the nature of the act." This difficulty has ceased to exist, for the article thus noticed has been omitted in the new Code.

We see no reason, from the language of the act, to restrict the benefit of the mortgage to *Dawson*, the mortgagee. Its purpose was to secure the debts named in it ; and the transferees of those debts are entitled to the benefit of the accessory. C. C. 2615.

We do not think the right acquired by the inscription of this mortgage in the parish of Carroll, was affected by the subsequent establishment of the parish of Madison, which embraced the lands mortgaged.

It is, therefore, decreed that the judgment of the court below be reversed. It is further decreed that the plaintiff, *Noah Hayden*, be recognized as the conventional mortgagee for the sum of $1097 36, with interest on said sum from the 4th day of February, 1838, of the following lands, to wit : the lands described in the indenture, or deed of mortgage opened in this cause, as the undivided half of the lots or parcels of land situate in the parish of Carroll, (now the parish of Madison,) numbered 24, 25, 26, 27, and 28, in township eighteen, of range thirteen east, in the district of lands north of Red river, Louisiana, containing in all eight hundred and ten acres ; and that the said lands be sold to pay the said mortgagee, the sum and interest aforesaid, and costs of this suit. It is further decreed that the judgment rendered on the 7th May, 1844, by the court of the Ninth Judicial District of Louisiana, sitting in and for the parish Madison, in favor of *Adeline Blake*, against her husband, *Conway R. Nutt*, for the sum of $26,883 70 and interest, with legal mortgage, and also the adjudication made at sheriff sale to the said *Adeline Blake*, upon execution of said judgment, and the sheriff's deed in pursuance of said adjudication, of which said judgment, adjudication and sheriff's deed copies are on file in this cause, and whereunto reference is now made, be adjudged null and void, so far as they affect the said *Noah Hayden*, and that the said *Noah Hayden* have leave to seize and sell the said lands, slaves and property in said sheriff's deed recited, upon *fieri facias* issuing upon the judgment, obtained for his use against *Conway R. Nutt*, on the 17th day of May, 1844, of which judgment a copy is on file in this cause, as though said adjudication and sheriff's deed to the said *Adeline Blake* had never been made.

It is further decreed that,[the said *Adeline Blake*, be recognized as a creditor of the said *Conway R. Nutt*, with legal mortgage, for the sum of $610 41, and interest from this date, being so much money, her paraphernal property, re-

HAYDEN
*v.*
NUTT.

ceived by her said husband on 1st July, 1839, and by him converted to his own use, said legal mortgage to date from the first day of July, 1839, and to take precedence of the claim of said *Hayden* as to all the real estate and slaves comprehended in said sheriff's deed, save only the real estate upon which the said *Hayden* is herein above recognized as a creditor by convential mortgage.

It is further decreed that, whatever claims and rights of legal mortgage the said *Adeline Blake* may have against the said *Conway R. Nutt,* by reason of her being the legatee of *Susan Blake,* be reserved, with leave to the said *Adeline Blake* to prosecute the same by way of third opposition or otherwise. And it is further decreed that, the said defendants pay the costs in both courts.